1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                                   DISTRICT OF NEVADA

8                                          * * *

                                            )
9    BATTLE MOUNTAIN BAND of the TE-         )
     MOAK TRIBE of WESTERN SHOSHONE          )
10   INDIANS,                                )          3:16-CV-0268-LRH-WGC
                                             )
11                 Plaintiff,                )
                                             )
12   v.                                      )          ORDER
                                             )
13   UNITED STATES BUREAU OF LAND            )
     MANAGEMENT and JILL C. SILVEY,          )
14                                           )
                   Defendants.               )
15   _____)

16          Before the court is plaintiff the Battle Mountain Band of the Te-Moak Tribe of Western

17   Shoshone Indians' ("Battle Mountain Band" or "the Band") renewed motion for a temporary

18   restraining order (ECF No. 12) which the court has construed as a motion for a preliminary

19   injunction (ECF No. 27). Defendants the United States Bureau of Land Management ("BLM") and

20   Jill C. Silvey (collectively "defendants"), along with intervenor Carlin Resources, Inc. ("Carlin"),[1]

21   filed oppositions to the motion (ECF Nos. 38, 45) to which the Battle Mountain Band replied

22   (ECF No. 53).

23          On June 2, 2016, the court held a hearing and heard argument on the Band's motion.

24   ECF No. 58. The following day, on June 3, 2016, the court issued a brief order denying the Band's

25   _____

26          [1] In response to the Band's complaint and motion for a temporary restraining order, Carlin filed a
     motion to intervene in this action pursuant to Federal Rule of Civil Procedure 24. ECF No. 20. On June 1, 2016,
     the court granted Carlin's motion. ECF No. 55.

1   motion finding that the Band had failed to show that it was likely to succeed on the merits of its

2   claims under the National Historic Preservation Act and the Religious Freedom Restoration Act.

3   ECF No. 60. However, as the court's brief order was issued the day following the hearing for the

4   benefit of the parties, the court stated that "[a] supplemental order addressing the entirety of the

5   parties' arguments, including additional defenses and the full merits of the Band's motion" would

6   be forthcoming. *Id.* This order constitutes the court's final order on the Battle Mountain Band's

7   motion for preliminary injunctive relief.

8   **I.      Facts and Procedural Background**

9          This action involves the various agency decisions and federal permits issued by the BLM

10  authorizing the construction of a power transmission line on land located in Elko County, Nevada

11  that has been identified by the Battle Mountain Band as its traditional cultural property ("TCP")[2]

12  and has recently been deemed eligible by the BLM for inclusion on the National Register of

13  Historic Places ("National Register").[3]

14     **A.  The Parties**

15          Plaintiff Battle Mountain Band is one of four bands that comprise and make up the Te-

16  Moak Tribe of Western Shoshone Indians ("Te-Moak Tribe"),[4] a federally recognized Indian tribe.

17  Since time immemorial, the Band and other member bands of the Te-Moak Tribe have lived in

---

[2] A "traditional cultural property" is one associated with "cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identify of the community." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1029 (9th Cir. 2007).

[3] If a particular location is identified by an Indian tribe as a traditional cultural property, then that land is treated as a TCP by the BLM for purposes of the National Historic Preservation Act. However, not all TCPs are eligible for inclusion on the National Register. Designation as a TCP is based on an Indian tribe's historical connection to a particular location and only requires the tribe claim an area as a TCP. In contrast, eligibility for the National Register is determined by federal laws and regulations governing historical properties. To be considered eligible for the National Register, a particular location must meet several criteria identified at 36 C.F.R. §60.4 which requires substantial evidence of historical use.

[4] The four bands that make up the Te-Moak Tribe are the Battle Mountain Band, and non-parties the Elko Band, the Wells Band, and the South Fork Band.

2

eastern and central Nevada. The Band currently resides on colony lands in close proximity to the Tosawihi Quarries.[5] The Band contends that the entirety of the quarries, including the specific TCPs at issue in this action, are a vital spiritual, cultural, and economic center for the Band and other member bands of the Te-Moak tribe. According to the Band, the quarries contain various TCPs like sacred sites, burial grounds, ceremonial locations, spiritual trails, and hunting grounds as well as, medicinal and natural resources central to its history, culture, and identity.

Defendant BLM is the federal agency responsible for overseeing and administering public lands, including the public lands on which the Tosawihi Quarries and the identified TCPs exist. As part of its administration of these lands, the BLM is authorized to issue permits and leases for use of the land. Defendant Jill C. Silvey ("Silvey") is the District Manager for the Elko District Office of the BLM and was the BLM officer involved in the various agency decisions and federal permits at issue in this action.

Intervenor Carlin is the current owner of certain mining rights within the Tosawihi Quarries. Approximately eight years ago, Carlin's predecessors-in-interest applied for a permit from the BLM to convert certain land in the quarries from an exploratory mining area into a functional mining operation. Carlin, as the current owner of the mining rights, is the interested party to the various agency decisions and federal permits issued by the BLM.

**B.  The Hollister Mine Project**

The Hollister Mine Project ("the project") is a now approved mining project located in and around the Tosawihi Quarries in Elko County, Nevada, an area that has been open to both active and exploratory mining for the past 100 years. The project was initially developed by non-party Rodeo Creek Gold, Inc. ("RCG"). In 2008, non-party RCG submitted an application for a mining

---

[5] The Tosawihi Quarries are the largest opalite quarry in the Great Basin and is approximately 3700 acres in size. Previous historical and anthropological research conducted at the quarries indicated that they have been utilized by indigenous people for at least 10,000 years. The entirety of the Tosawihi Quarries is located within a naturally designated historical and archaeological district known as the Tosawihi Quarries Archaeological District. Portions of the quarries have been open to various mining activities for over 100 years.

1   permit and plan of operations for the project to the BLM. The project plan outlined the proposal to

2   transition existing underground exploration activities to a full-scale active mining operation that

3   would require the development of new mining facilities and associated infrastructure. As part of the

4   project, approximately 12 miles of electric power transmission line would need to be placed and

5   run to the mine. Relevant to this action is the 4.5 mile long 24.9 kV distribution line that would run

6   from a newly constructed power substation at the entrance to the Tosawihi Quarries to a newly

7   constructed switch gear facility located at the underground mine facilities. The entirety of the

8   power line was designed to run along and parallel to Little Antelope Creed Road, an established

9   roadway that leads into the quarries. Once operational, the mine is expected to last for

10  approximately 20 years, after which all of the mining facilities and associated infrastructure would

11  be removed and the underlying land restored.

12          After receiving and reviewing the proposed project, the BLM published a Notice of Intent

13  for the project on April 19, 2010. In the fall of 2010, Carlin and the BLM conducted a Class III

14  historical survey and inventory[6] on the project as part of its compliance with Section 106 of the

15  National Historic Preservation Act ("NHPA"). The survey specifically examined the feasibility of

16  constructing mining facilities and associated infrastructure, including the 4.5 mile 24.9 kV power

17  line, within the Tosawihi Quarries and whether the project would be located on any historical or

18  cultural land. The results of this inventory were submitted to defendant Silvey and the Nevada State

19

20  _____

21          [6] As described in *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005-06 (9th Cir. 2013), three
     different classes of cultural and environmental surveys are recognized under the NHPA. A Class I survey is "a
22   professionally prepared study that includes a compilation and analysis of all reasonably available cultural
     resource data and literature, and a management-focused, interpretive, narrative overview, and synthesis of the
23   data." *Id*. A Class II survey is a more in-depth survey and is known as a "probabilistic field survey" or
     "statistically based sample survey." *Id*. Class II surveys "aid in characterizing the probable density, diversity,
24   and distribution of cultural properties in an area." *Id*. A Class III survey is the highest survey level and the most
     in-depth survey conducted on a project. *Id*. In particular, a Class III survey is an "intensive survey that involves
25   a professionally conducted, thorough pedestrian survey of an entire target area . . . intended to locate and record
     all historic properties and that provides managers and cultural resource specialists with a complete record of
26   cultural properties." *Id*. If a Class III survey is conducted on a project it is presumed that the federal agency
     complied with the requirements of Section 106 of the NHPA.

Historic Preservation Officer ("NSHPO") in June 2011. The Class III survey identified a total of twenty different TCPs that were eligible for listing on the National Register, and determined that these eligible TCPs would be impacted by the project in some manner thereby requiring further analysis and review under Section 106 of the NHPA. However, the TCPs at issue in this action were not included in the Class III survey eligibility list.

On June 1, 2012, a draft Environmental Impact Statement ("EIS") was completed and distributed for public comment.[7] The draft EIS specifically considered the possibility of burying the power line within Little Antelope Creek Road as an alternative to running the power line along the roadway, but determined that such an underground alternative was not economically or environmentally feasible. *See* ECF No. 45, Exhibit 1 (finding that "the belowground transmission line alternative would increase impacts to soil, vegetation, surface water, and cultural resources due to greater surface disturbance for installation of the underground transmission line and the necessity to maintain a cleared [right of way]" and that "from an electrical engineering and construction standpoint, underground . . . transmission lines are economically prohibitive due to higher construction, maintenance, and safety costs . . . ."). Maps included in the draft EIS showed the power line passing through the TCPs at issue in this action.

After the public disclosure and comment period expired on the draft EIS in July 2012, the BLM and RGC, Carlin's predecessor-in-interest, along with non-parties the NSHPO and the Advisory Council on Historic Preservation ("ACHP"), negotiated an ongoing agreement for the preservation of historic lands during the entirety of the project, known as the Programmatic Agreement ("PA").[8] During the drafting process of the PA, several Indian tribes including the

---

[7] A copy of the draft EIS is attached as Exhibit 1 to the BLM's opposition to the underlying motion. *See* ECF No. 45, Exhibit 1.

[8] As outlined in 34 C.F.R. §800.14, the ACHP and other relevant parties "may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" on historic lands. A programmatic agreement constitutes the governing document for a particular project as it relates to determining and dealing with the environmental impacts of a project on historical land, and supersedes certain federal regulations. *See* 36 C.F.R. §§800.13-

1   Battle Mountain Band were invited to review and comment on the PA. The Band was also invited

2   to sign the PA as a concurring party, but declined.

3      In 2013, a second Class III survey was conducted on the project. As a result of that survey,

4   and additional information provided by the Band, additional TCPs within the Tosawihi Quarries

5   were deemed eligible for inclusion in the National Register, but the TCPs at issue in this action

6   were once again not included on this eligibility list. On May 21, 2014, the BLM completed and

7   published the final EIS for the project.[9] The final EIS specifically discussed and approved the 24.9

8   kV power transmission line as an above ground line running along Little Antelope Creek Road. On

9   March 31, 2014, following six-years of NEPA and NHPA review, as well as continued consultation

10   with the Battle Mountain Band, the BLM issued its Record of Decision ("ROD") approving the

11   project.[10] Subsequently, on April 30, 2014, the BLM issued Carlin a right-of-way ("ROW") for

12   construction of the power line to Carlin pursuant to the Federal Land Policy and Management Act,

13   43 U.S.C. § 1761.

14      During the fall of 2015, a year after the ROD and ROW were issued, Carlin contracted a

15   company to survey and stake the power line along Little Antelope Creek Road. During tribal

16   monitoring activities, the survey company identified several cultural materials in the vicinity of a

17   

18   800.14. Programmatic agreements are particularly useful "[w]hen effects on historic properties cannot be fully
determined prior to approval of an undertaking." 36 C.F.R. § 800.14(b)(1)(ii). "Compliance with the procedures

19   established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all
individual undertakings of the program covered by the agreement . . . ." Id. § 800.14(b)(2)(iii); *Snoqualmie*

20   *Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1216 (9th Cir. 2008) (when the Advisory Council signs a
programmatic agreement that "closes the record for purposes of NHPA § 106."); *Franco v. United States Forest*

21   *Serv.*, 2016 WL 1267639, at *5 (E.D. Cal. Mar. 31, 2016) ("Compliance with the procedures established by
an approved programmatic agreement satisfies the agency's NHPA Section 106 responsibilities for all

22   individual undertakings covered by the PA."). A copy of the Programmatic Agreement is included as Exhibit

23   5 to the BLM's opposition to the underlying motion. *See* ECF No. 45, Exhibit 5.

24     [9] A copy of the final EIS is attached as Exhibit 4 to the Battle Mountain Band's reply to its motion. *See*
ECF No. 53, Exhibit 4, p.39-46.

25     [10] A copy of the ROD is attached as Exhibit 1 to Carlin's opposition to the underlying motion. *See*

26   ECF No. 38, Exhibit 1.

1   number of previously identified archaeological sites, and expanded or updated the boundaries of

2   those sites. The power line was accordingly redesigned, placing all utility poles and access routes

3   outside of those site boundaries. Subsequently, on March 30, 2016, the BLM issued Carlin a Notice

4   to Proceed with construction activities of the 24.9 kV power line. Construction of the power line

5   was set to begin May 23, 2016, but Carlin voluntarily stayed construction pending the court's

6   June 3, 2016 decision upon the Battle Mountain Band's motion.

7          **C. This Action**

8          In 1999 and 2000, the BLM, upon information provided by the Battle Mountain Band,

9   concluded that certain TCPs within the Tosawihi Quarries were eligible for inclusion on the

10   National Register. At that time, the various TCPs deemed eligible for inclusion on the National

11   Register did not include the TCPs identified in this action because, based upon information

12   provided by the Band at the time, the BLM determined that these lands did not satisfy the

13   requirements for a historic site codified at 36 C.F.R. §60.4. Since that time, the Band has contested

14   the BLM's limited inclusion of TCPs within the Tosawihi Quarries on the National Register and

15   has continuously petitioned for more TCPs to be included. During the Class III surveys conducted

16   in 2010 and 2013, the Band met with the independent surveyors and provided additional

17   information about the Band's historical and current use of the Tosawihi Quarries. As a result of

18   those surveys, additional TCPs were deemed eligible for inclusion on the National Register.

19   However, the TCPs at issue in this action were not.

20          In late 2015, after the project ROD and ROW had been issued, the Band invoked the

21   dispute resolution provisions under the project PA in an effort to have the BLM determine the

22   eligibility of the TCPs at issue in this action for inclusion on the National Register. On December

23   22, 2015, as part of this dispute resolution process, the ACHP issued an opinion to the BLM

24   advising the BLM that sufficient information had been provided by the Band for the BLM to

25   complete its eligibility determination for the identified TCPs. On April 19, 2016, in compliance

26

7

1    with the ACHP's December opinion, the BLM determined that based upon the new information

2    provided by the Band during the dispute resolution process, the previously identified TCPs were

3    eligible for inclusion on the National Register. On the same day, the NSHPO concurred in the

4    BLM's findings.

5         On May 19, 2016, after the BLM issued the Notice to Proceed to Carlin for the construction

6    of the power line, the Battle Mountain Band filed the underlying complaint against defendants for

7    declaratory and injunctive relief. ECF No. 31. In its complaint, the Band alleges three claims

8    against defendants: (1) violation of NHPA; (2) violation of the Religious Freedom Restoration Act

9    ("RFRA"); and (3) violation of the Indian trust responsibility. *Id*. Specifically, the Band alleges that

10    the BLM violated the substantive requirements of the NHPA by failing to reconsider its prior

11    decision to allow Carlin to build a power line through land which the BLM now considers eligible

12    for the National Register, and violated the RFRA by failing to assess the impact that the

13    construction of the power line would have on the Band's religious activities. *Id*. Along with its

14    complaint, the Battle Mountain Band filed the present motion for a temporary restraining order

15    (ECF No. 12) which the court has converted to a motion for a preliminary injunction (*See*

16    ECF No. 27). In its motion, the Battle Mountain Band seeks an injunction enjoining the BLM from

17    "issuing any authorizations or notices to proceed for any work related to the Power Line pending

18    resolution of this matter; and . . . from allowing or permitting any ground-disturbing activities

19    related to the Power Line as currently planned, including enjoining all earth work or work in

20    preparation of or construction of foundations for power poles or other structures related to the

21    Power Line pending resolution of this matter." ECF No. 12.

22    **II.**    **Legal Standard**

23         A court may grant a preliminary injunction upon a showing of: (1) irreparable harm to the

24    petitioning party; (2) the balance of equities weighs in petitioner's favor; (3) an injunction is in the

25    public's interest; and (4) the likelihood of petitioner's success on the merits. *See Winter v. Natural*

26

1  *Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008) (citations omitted). In *Winter*, the Supreme

2  Court stated that a "likelihood" is required as to all four factors. *See* 555 U.S. at 22. The Ninth

3  Circuit has since interpreted the *Winter* decision as being compatible with a sliding scale, under

4  which a party may satisfy the requirements for an injunction with a lower showing under one factor

5  if there is a very strong showing under another. *See Alliance for the Wild Rockies v. Cottrell*, 632

6  F.3d 1127, 1131 (9th Cir. 2011). Under the sliding scale approach, the Ninth Circuit has

7  determined that "serious questions" as to the merits of a complaint would satisfy the "likelihood of

8  success" requirement in the event of a strong showing of irreparable harm. *Id.*

9  **II.   Discussion**

10 **A. Likelihood of Success on the Merits**

11 "The sine qua non of preliminary injunction inquiry is likelihood of success on the merits: if

12 the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors

13 become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d

14 1, 9 (1st Cir. 2002). However, a plaintiff may be awarded a preliminary injunction by establishing

15 "that serious questions going to the merits were raised and the balance of hardships tips sharply in

16 the plaintiff's favor" so long as the plaintiff satisfies the additional *Winter* factors including

17 irreparable harm and that an injunction is in the public's interest. *Alliance for Wild Rockies*, 632

18 F.3d at 1131.

19 In this action, the Battle Mountain Band has brought claims under two federal statutes, the

20 NHPA and the RFRA. In its motion, the Band contends that it is likely to succeed on each of these

21 claims sufficient to warrant a preliminary injunction. *See* ECF No. 12. The likelihood of success

22 under each statute is addressed below.

23 **1. National Historic Preservation Act**

24 The NHPA was enacted by Congress in 1966 to encourage preservation of historic sites and

25 buildings. *See* 16 U.S.C. §470a(d)(1)(A); *Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 226

26

1    (10th Cir. 1981) ("The purpose of the National Historic Preservation Act (NHPA) is the

2    preservation of historic resources."). To accomplish those goals, the act is "aimed solely at

3    discouraging federal agencies from ignoring preservation values in projects they initiate, approve

4    funds for or otherwise control." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989). Under

5    the NHPA, federal agencies are required to consider the potential effects of agency actions taken on

6    historic properties. 16 U.S.C. § 470f (2013).[11] However, the act "neither . . . forbid[s] destruction of

7    historic sites nor . . . command[s] their preservation." *United States v. 162.20 Acres of Land*, 639

8    F.2d 299, 302 (5th Cir. 1981). Instead, Section 106 of the NHPA requires a federal agency to "take

9    into account the effect of [an] undertaking on any district, site, building, structure, or object that is

10   included in or eligible for inclusion in the National Register." *Id*. Section 106 is considered a "stop,

11   look, and listen provision[.]" *Muckelshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 805

12   (9th Cir. 1999).

13          The Advisory Council on Historic Preservation, a federal agency created under Section 201

14   of the NHPA, is the administrative agency that oversees compliance with Section 106. *See* 16

15   U.S.C. §§ 470i, 470s. The ACHP has promulgated regulations to governing federal agency

16   compliance with Section 106 of the NHPA, codified at 36 C.F.R. §800 *et seq*.[12] First, the agency

17   must make a reasonable and good faith effort to identify historic properties by conducting a survey

18   or inventory of the site on which a project is to occur. 36 C.F.R. §800.4(b). If a historical property

19   is identified, the agency must then (1) determine whether identified properties are eligible for

20   listing on the National Register based on the criteria set forth in 36 C.F.R. §60.4; (2) assess the

21

22          [11] The NHPA has been repealed and recodified at Title 54 of the United States Code, "except with
     respect to rights and duties that matured, penalties that were incurred, or proceedings that were begun before

23   the date of enactment of [the recodification]." PUB. L. NO. 113-287, §7, 128 STAT. 3272, 3272-73 (2014).
     Because the mining project and associated review proceedings began before the recodification, ths order will

24   continued to refer to the earlier codification.

25          [12] Although not an administrative agency, the ACHP's regulations "command substantial deference."
     *North Oakland Voters Alliance v. Oakland*, 1992 U.S. Dist. LEXIS 19033, *8 (N.D. Cal. 1992) (quoting

26   *McMillan Park Committee v. National Capital Planning Commission*, 968 F.2d 1283, 1288 (D.C. Cir. 1992).

1    effects of the undertaking on any eligible historic properties and determine whether those effects

2    will be adverse or not; and (3) avoid or mitigate any adverse effects. *See* 36 C.F.R. §§800.4-800.9.

3    Further, if a project involves land identified by an Indian tribe as a traditional cultural property, the

4    federal agency must consult[13] with the tribe through the entire Section 106 process. 16 U.S.C.

5    §470a(d)(6). These regulations come into play once a federal agency determines that a project

6    qualifies as an "undertaking" that "has the potential to cause effects on historic properties." 36

7    C.F.R. §800.3(a).

8         The NHPA itself does not provide for a private right of action. *See San Carlos Apache*

9    *Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005) (NHPA Section 106 "does not give rise

10   to a 'private' right of action against the federal government."). Where a statute, such as the NHPA,

11   does not provide for a private right of action a party challenging the federal government's decision

12   under that statute must rely on the Administrative Procedures Act, 5 U.S.C. §§ 701-706. *See Lujan*

13   *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882083 (1990). Under the APA, a federal court "shall . . .

14   hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

15   capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

16   § 706(2)(A); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124-25 (9th Cir. 2007).

17        Review under the arbitrary and capricious standard is narrow, and the court must not

18   substitute its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987

19   (9th Cir. 2008), overruled in-part on other grounds by *Friends of the Wild Swan v. Weber*, 767 F.3d

20   936, 949 (9th Cir. 2014). Nonetheless, the court must engage in a substantial inquiry of the

21   agency's action. *Brong*, 492 F.3d at 1125. To meet its burden under this standard, an agency must

22   present a "rational connection between the facts found and the conclusions made." *Id*. An agency's

23

24        [13] This consultation must provide the Indian tribe "a reasonable opportunity to identify its concerns
25   about historic properties, advise on the identification and evaluation of historic properties, including those of
     traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties,
26   and participate in the resolution of adverse effects." 36 C.F.R. §800.2(c)(2)(ii)(A).

1   decision is arbitrary and capricious if it was not "based on a consideration of the relevant factors"

2   or if there was a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

3   U.S. 402, 416 (1971).

4          In its motion, the Battle Mountain Band contends that it is likely to succeed on the merits of

5   its NHPA claim because the BLM failed to comply with Section 106 of the NHPA when it refused

6   to re-evaluate the environmental impact of the power line after it determined that the identified

7   TCPs at issue in this action were eligible for inclusion on the National Register. In particular, the

8   Band contends that prior to the BLM's April 2016 decision, the BLM was not required to assess the

9   adverse effects of the power lines on this land and was within its rights to issue the March 2014

10  ROD allowing Carlin to construct the power line. However, upon accepting the identified TCPs as

11  eligible for the National Register, the Band contends that the BLM was then required to reexamine

12  its ROD and other relevant decisions before allowing Carlin to proceed with construction. By

13  refusing to evaluate the adverse effect that the construction or operation of the power lines will

14  have on the land, the BLM necessarily violated the NHPA and its decision to do so was arbitrary

15  and capricious under the APA. The court disagrees.

16         Initially, the court notes that the Battle Mountain Band is not challenging the BLM's

17  compliance with Section 106 on the project prior to the April 2016 finding. Rather, the Band

18  concedes that the BLM complied with Section 106 for the project up to that point and also

19  complied with all of its consultation obligations throughout the history of this project and thus, the

20  BLM fully satisfied its obligation to "make [a] reasonable and good faith effort" to identify historic

21  properties within the undertaking's area of potential effects. 36 C.F.R. § 800.4(b)(1). Further, the

22  Band concedes that the BLM and Carlin entered into a PA for the project which was signed by the

23  ACHP. When the ACHP signs a PA, that action "closes the record for purposes of NHPA § 106."

24  *Snoqualmie Indian Tribe*, 545 F.3d at 1216. As such, the BLM's compliance with Section 106 prior

25  to the April 2016 decision is not at issue.

26

12

1    The sole issue before the court is whether the BLM was required to conduct a new Section

2    106 adverse impact analysis under the NHPA and the project PA on the 24.9 kV power line after its

3    April 2016 National Register eligibility finding. In order to address the Band's argument, the court

4    must first determine whether the construction of the power line constitutes an undertaking under

5    the NHPA; then, if it does not, the court must determine whether the TCPs addressed in the BLM's

6    April 2016 eligibility finding constitute a previously unanticipated discovery under the NHPA.

7    Each issue is addressed below.

8            **a.   Undertaking under the NHPA**

9         The first issue for the court is whether the construction of the 24.9 kV power line

10   constitutes a separate undertaking under the NHPA requiring its own Section 106 compliance. The

11   NHPA defines undertaking as "any action as described in [Section 106] of this Title,' but there is

12   no more specific definition of an 'undertaking' within [that section]." *North Oakland Voters*

13   *Alliance*, 1992 U.S. Dist. LEXIS 19033, at *11. However, the ACHP defines an undertaking as

14   "any project, activity, or program that can result in changes in the character or use of historic

15   properties." 36 C.F.R. §800.2(o). Included in this definition are "new and continuing projects,

16   activities, or programs and any of their elements not previously considered under Section 106."

17   *North Oakland Voters Alliance*, 1992 U.S. Dist. LEXIS 19033, at *18. "Implied in this definition is

18   the proposition that where a project's Section 106 review has already been completed, and no new

19   elements have been added to the project, it does not amount to an undertaking." *Id.* (citing

20   *McMillan Park Committee*, 968 F.2d at 1287-88).

21        Here, the court finds that the Notice to Proceed allowing for construction of the power line,

22   and any subsequent construction of the power line itself, is not an undertaking under the NHPA. As

23   established above, the Band is not challenging the BLM's original Section 106 process for the

24   project and the project's Section 106 review has already been completed. The construction of the

25   24.9 kV power line was part of the mining project from the beginning and was identified in both

26

1  the draft and final EIS before being ultimately approved in the ROD. Further, as the construction of

2  the power line does not require any modification to the existing project, there is no new

3  undertaking separately subject to Section 106 compliance. *See McMillan Park Committee*, 968

4  F.2d at 1287-88; *see also, Grand Canyon Trust v. Williams*, 98 F. Supp. 3d 1044 (D. Ariz. 2015)

5  (holding that a project that does not require a modification to an existing plan is not an undertaking

6  subject to NHPA compliance). Accordingly, the court finds that the Notice to Proceed and

7  construction of the power line is not a separate undertaking and thus, the BLM was not required to

8  perform a separate Section 106 analysis for the construction of the power line.

9  **b. Subsequent Unanticipated Discovery**

10  As the court has found that the construction of the power line does not constitute a new

11  undertaking under NHPA, the court now turns to whether the BLM's April 25, 2016 determination

12  that previously identified TCPs were now eligible for inclusion on the National Register constitutes

13  an "unanticipated discovery" or a "post-review" discovery sufficient to trigger additional Section

14  106 responsibilities. As addressed below, the court finds that it does not.

15  As part of its motion, the Band contends that the BLM has a duty to continue reviewing the

16  impact of a project located on historical land as changes to the project or the designation of the

17  public land occur. *See* ECF No. 12. Although the Band is correct that the regulations promulgated

18  by the ACHP recognize an ongoing obligation to undertake additional Section 106 analysis during

19  a project, that ongoing obligation is triggered only: (1) when the implementing agency discovers

20  previously unidentified properties that are eligible for inclusion in the National Register;[14] (2) when

21  stage-by-stage compliance with NHPA is contemplated;[15] or (3) when a modification occurs with

22  respect to a project for which NHPA review previously had been completed.[16]

23  _____

24  [14] *See* 36 C.F.R. §800.13.

25  [15] *See Morris County Trust*, 714 F.2d at 279-81.

26  [16] *See Watch v. Harris*, 603 F.2d 310, 325-26 (2nd Cir. 1979).

1    Here, the mining project does not contemplate stage-by-stage compliance with NHPA. Nor

2    does the power line constitute a modification to the project as it was included in the initial project

3    plans and addressed in the draft and final EIS. Thus, the BLM's ongoing obligation for additional

4    Section 106 analysis was only triggered if the TCPs recently deemed eligible for inclusion in the

5    National Register were "previously unanticipated properties." *See* 36 C.F.R. §800.13.

6    New discoveries of historical properties during a project are governed by 36 C.F.R.

7    §800.13. That section, entitled "Post-Review Discoveries," lays out specific obligations for a

8    federal agency upon the discovery of new historical properties after the completion of a Section 106

9    review of a project, but before the project has been completed. *Id.* Relevant to this action is Section

10    800.13(a) which states that parties to a project can develop a PA under Section 800.14(b) "to

11    govern the actions to be taken when historic properties are discovered during the implementation of

12    an undertaking." 36 C.F.R. §800.13(a)(1). Here, the parties entered into a PA for the project, and

13    the PA governs the BLM's obligations for unanticipated discoveries. In this action, the PA contains

14    a protocol for the assessment of historical properties discovered during project activities. *See* ECF

15    No. 45, Exhibit 5, Appendix C: Section A, p.20 ("If a previously unidentified Cultural Resource is

16    discovered . . . ."). However, as the Band acknowledges in its pleadings, this protocol applies only

17    to properties not previously identified during the initial Section 106 review for a project and are

18    subsequently discovered while conducting project activities. The PA does not impose any ongoing

19    obligation to continuously consult and re-review previously identified properties simply because

20    new information about the historical use of those properties has been provided to the BLM.

21    The court has reviewed the documents and pleadings on file in this matter and finds that

22    there are no previously unidentified historical properties at issue in this action triggering additional

23    Section 106 analysis. The TCPs identified by the Band and deemed eligible for inclusion on the

24    National Register by the BLM in April 2016 were identified by the Band and evaluated by the BLM

25    throughout the NEPA and NHPA process. In fact, the newly eligible TCPs were identified by the

26

1  Band in both the 2010 and 2013 Class III surveys during which the Band failed to provide

2  sufficient information about its historical use of the TCPs for the BLM to determine their eligibility

3  for the National Register at those times. Further, prior to this action, the BLM specifically

4  considered whether the newly eligible TCPs were "unanticipated discoveries" within the meaning

5  of the PA and found that "additional lithic scatter that changes site boundaries within a previously

6  Class III surveyed area does not meet the intent of the definition of an unanticipated discovery

7  under the PA. Site amendments are adjustments to the boundaries of previously identified sites and

8  therefore do not meet the criteria of 'unanticipated discoveries.'" ECF No. 53, Exhibit 3, p. 37-38.

9  The court agrees with the BLM's finding that these previously identified TCPs are not

10  "unanticipated discoveries" under the PA. As such, the BLM was not required under the PA or the

11  NHPA to conduct any new Section 106 adverse impact analysis on the underlying power line.[17]

12      **2. Religious Freedom Restoration Act[18]**

13      Under the Religious Freedom Restoration Act of 1993 ("RFRA"), the federal government

14  may not "substantially burden a person's exercise of religion even if the burden results from a rule

15  of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a); *see also,*

16  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1083 (9th Cir. 2008). "Exercise of religion" is

17  defined to include "any exercise of religion, whether or not compelled by, or central to, a system of

18  religious belief." 42 U.S.C. § 2000bb-2(4), 2000cc-5(7)(A). Subsection (b) of § 2000bb-1 provides,

19  the "Government may substantially burden a person's exercise of religion only if it demonstrates

20

---

21      [17] Both the BLM and Carlin also raised a laches defense to the present motion for injunctive relief
22  arguing that the Battle Mountain Band is barred from raising its NHPA challenge because it did not provide
the information about its historic and cultural use of the TCPs during the entirety of the Section 106 process.
23  As the court has found that the Band is not likely to succeed on the merits of its NHPA claim, the court finds
it unnecessary to address the laches argument at this time.

24      [18] Although raised in the Battle Mountain Band's motion for a temporary restraining order, little
25  substantial argument for its claim under the RFRA is addressed compared with the NHPA claim. The Band's
RFRA was a secondary argument that was barely addressed by the Band in the entirety of its pleadings. In fact,
26  in all of the Band's briefs on this matter, less than 2 pages was dedicated to the RFRA claim.

1  that application of the burden to the person - (1) is in furtherance of a compelling governmental

2  interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

3  42 U.S.C. § 2000bb-1(b). A substantial burden under the RFRA exists only when government

4  action "forces individuals to choose between following the tenants of their religion and receiving a

5  government benefit." *S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1207 (D. Nev.

6  2009); *see also, Navajo Nation*, 535 F.3d at 1083.

7         In an action under the RFRA, the plaintiff bears the initial burden of proof on whether a

8  policy substantially burdens his or her exercise of religion. *Hartmann v. Cal. Dep't of Corrections*,

9  707 F.3d 1114, 1124 (9th Cir. 2013). If the plaintiff meets this initial burden, "the government

10 bears the burden of establishing that the regulation serves a compelling government interest and is

11 the least restrictive means of achieving that interest." *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir.

12 2008).

13        In its motion, the Battle Mountain Band argues that the construction of the power lines as

14 currently configured, running above the ground in an area reserved for spirits and prayers, will

15 prevent the Band from engaging in and exercising its religious activity and could result in the Band

16 losing its religious practices for the life of the mine and maybe forever. *See* ECF No. 12. The court

17 has reviewed the documents and pleadings on file in this matter and finds that the Band is not likely

18 to succeed on the merits of its RFRA claim because the Band has not alleged sufficient facts

19 establishing a prima facie case of religious impairment under the RFRA. In particular, the Band

20 does not allege that construction of the power line as currently designed will impose a substantial

21 burden on the Band's exercise of religion as the power line's construction is only over a small

22 portion of a TCP and along an existing roadway that already runs through the same zone. As the

23 power line follows the road, and the Band has not argued that the road impacts its religious

24 freedom, the court finds that the similarly situated power line would impact its religious freedom.

25 Further, the Band has failed to provide any evidence that the mere sight of the power line along a

26

1  spirit trail would impact their religious activities. The power line will consist only of single wooden

2  poles constructed directly beside the road and avoiding all known historical and cultural sites

3  located on the ground. The Band will still be able to utilize the areas during and after construction

4  of the power line and thus, the Band is not being foreclosed from engaging in or exercising its

5  religious activities. As such, the court finds that the construction and operation of the power line

6  will not substantially burden or restrict the Band's exercise of religion. Therefore, the court finds

7  that the Band is not likely to succeed on its RFRA claims.

8  **B. Irreparable Harm**

9      A plaintiff must show that an irreparable injury is *likely*, not merely *possible*, before a

10  temporary restraining order may be issued. *American Trucking Ass'ns v. City of Los Angeles*,  F.3d

11  1046, 1052 (9th Cir. 2009) (reversed on other grounds *Am. Trucking Ass'ns v City of Los Angeles*,

12  596 F.3d 602 (9th Cir. 2010)) (emphasis added). "Issuing an [injunction] based only on a

13  possibility of irreparable harm is . . . an extraordinary remedy that may only be awarded upon a

14  clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375-76.

15      In this action, the Battle Mountain Band contends that it will be irreparably harmed if the

16  court does not issue an injunction because the construction of the power line will lead to the

17  desecration and destruction of historic lands that play a significant part of the history and culture of

18  the Western Shoshone Indian tribe. ECF No. 12. Such injuries have previously been held to be

19  irreparable. *See, e.g., Friends of Astor, Inc. v. City of Reading*, 1998 WL 684374 at *12 and n. 35

20  (noting that destruction of alleged historical property would "clearly . . . result in irreparable

21  harm"); *see also, Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 ("The Supreme Court has

22  instructed us that environmental injury, by its nature, can seldom be adequately remedied by money

23  damages and is often permanent or at least of long duration, *i.e.*, irreparable.") (internal punctuation

24  omitted).

25      However, the court finds that the band has failed to meet its burden of establishing

26

1   irreparable harm as it has submitted nothing but conclusory allegations that because the power line

2   is located within a TCP, the power line will create an irreparable environmental injury. It has

3   already been addressed, and is undisputed that the power line is located outside of any sites that

4   contain historical and cultural artifacts. In fact, the power line was redesigned in 2015 as a result of

5   a survey setting out the placement of the wooden poles. Further, it is undisputed that Carlin was

6   required to post a substantial reclamation bond prior to receiving the Notice to Proceed so that the

7   land can be restored to its pre-construction condition. Therefore, the court finds that the Band has

8   not established any irreparable injury resulting from the construction of the power line to warrant

9   preliminary injunctive relief in this action.

10          **C. Balance of Equities**

11          In seeking a preliminary injunction, a plaintiff must demonstrate that his claim presents a

12   serious question of law and that the current litigation has merit so as to avoid undue harm to the

13   defendant. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).

14   Additionally, the plaintiff must suffer a degree of hardship that outweighs the hardship placed upon

15   all other parties by the injunction. *Id.*

16          Here, the Battle Mountain Band argues that there is no significant harm to the BLM by the

17   issuance of an injunction because the BLM is a government agency and has no property interest in

18   the mine or in the upcoming construction project. As such, the Band argues that an injunction

19   preventing the construction of power lines would not impact the BLM. However, the BLM is not

20   the only party in this action that would be effected by the issuance of an injunction. The court must

21   also evaluate the impact than an injunction would have on intervenor Carlin who was supposed to

22   begin construction on the power line on May 23, 2016, a full eight years after the project plan was

23   submitted to the BLM.

24          The court has reviewed the balance of equities in this action and finds that it weighs against

25   the Band's request for an injunction. The requested preliminary injunction threatens to impair

26

1 Carlin's vested property rights under its federal permits and Carlin has invested substantial funds

2 and resources (over millions of dollars) in reliance on its valid existing rights under the ROD and

3 ROW. The delay in construction of the power line will delay the start of the mine costing Carlin

4 millions of more dollars in ongoing costs for the delayed construction, the seeking of new permits,

5 and the loss of potential mining profits. Therefore, the court finds that the balance of equities does

6 not favor an injunction.

7       **D. Public's Interest**

8       Before granting an injunction the court must determine that an injunction is in the public's

9 interest. *Winter*, 129 S. Ct. at 375-76.

10       Here, the Battle Mountain Band argues that the public has a strong interest in the protection

11 of historic property because Congress mandated a specific procedure for federal agencies to follow

12 as outlined in the NHPA. *See* ECF No. 12. The court agrees. However, the court notes that there is

13 a comparable public interest in the protection of a business' reasonable investment-backed

14 expectations when involved with government agencies. This public interest would be disserved by

15 allowing the Band to attack a lengthy, expensive, and complex NHPA process years after the

16 conclusion of the ROD and after an interested party like Carlin has invested millions of dollars in

17 the project under that approved ROD. Further, the public's interest in protecting historic properties

18 was successfully engaged in during the Section 106 process. The public has no additional interest in

19 an injunction after the completion of the NHPA process. Accordingly, the court shall deny the

20 Battle Mountain Band's motion for preliminary injunctive relief.

21 ///

22 ///

23 ///

24 ///

25 ///

26

1    IT IS THEREFORE ORDERED that plaintiff's motion for a temporary restraining order

2   (ECF No. 12) is DENIED in accordance with this order.

3    IT IS SO ORDERED.

4   DATED this **25** day of August, 2016.

5   _____
    LARRY R. HICKS
6   UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26